**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| LEONARD LEVIE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRANDON STEWART et al.,<br><br>Defendants. | Case No. 2:26-cv-00240-KHR<br><br>**DECLARATION OF BRANDON STEWART IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF BRANDON STEWART**

I, Brandon Stewart, declare and state as follows:

1. I am a resident of Pennsylvania and the sole member and manager of Michigan Precision Group, LLC ("MPG") and the majority owner of VECCO Aerospace Group, Inc. ("VAG"). I make this declaration from my own personal knowledge and from MPG's business records maintained in the ordinary course. I personally participated in the transactions, communications, and operations described below. If called as a witness, I could and would testify competently to these matters.

## I. BUSINESS ASSOCIATION WITH PLAINTIFF LEONARD LEVIE, AMERICAN INDUSTRIAL ACQUISITION CORPORATION, AND JONATHAN BATISTA

2. I have been involved in brokering company acquisitions since July 2008. My work includes sourcing industrial acquisition opportunities, contacting executives and owners, determining whether a business may be available for sale, and collecting financial and other information about the target. In my role as a broker, I present those opportunities to prospective buyers and assist with evaluating the business, negotiating transaction terms, conducting due diligence, and arranging acquisition financing, where applicable. After a target company is acquired, I lead turnaround efforts, including by creating a new branded entity name and website for the acquired company, restructuring contracts with suppliers and customers, hiring a new management team, resolving customer disputes, addressing inventory, payments, and accounts-payable and accounts receivables issues.

3. I also routinely acquire companies for my own account, either with other investors or independently.

4. On May 25, 2011, I entered into a commission agreement (the "Commission Agreement") with American Industrial Acquisition Corporation ("AIAC")—a company I understand to be owned by Leonard Levie.

5. The Commission Agreement provided the parties' agreement on how I would be compensated for identifying corporate acquisition targets to AIAC; if AIAC proceeded with the acquisition of a target I identified, I was to receive a certain commission. Attached as **Exhibit B** is a true and correct copy of the Commission Agreement.

6. The Commission Agreement does not contain an exclusivity provision, and I did not understand it to require me to present every potential acquisition opportunity to AIAC or to present opportunities only to AIAC. Rather, my understanding was that if I identified, contacted, and presented an acquisition target that AIAC was not already actively pursuing, and AIAC or an affiliate ultimately acquired that target, I would be entitled to a commission. My fifteen-year

history with AIAC of brokering acquisitions is consistent with that understanding.

7. Through my work under the Commission Agreement, Mr. Levie and I held joint ownership interests in a number of businesses where I brokered the acquisition, including entities both inside and outside the United States. Attached as **Exhibits C and D** are true and correct copies of share transfer forms reflecting certain of those co-owned interests.

8. In those transactions, Mr. Levie's interest was documented at or before closing. For instance, in connection with a separate company that I brought to Mr. Levie and we purchased together in 2017 (Keycast/Combi Wear Parts), Mr. Levie signed the Sale and Purchase Agreement. A true and correct copy is attached as **Exhibit E**. My ownership interest was well documented, including through board meeting minutes executed by Mr. Levie assigning my company, Carnegie Industries, LLC, a 5% ownership interest, and the dividends I receive each year for those shares. True and correct copies of the board meeting minutes and a dividend statement are attached as **Exhibits F and G** respectively. No comparable document exists for MPG. No share transfer form, subscription, member consent, or other instrument has ever been executed conveying any interest in MPG to any Plaintiff.

9. On other occasions, Mr. Levie and I had differing commercial interests, and I pursued independently certain ventures in which Mr. Levie had no ownership or other financial interest. Those ventures included ventures that I first brought to AIAC's attention, but Mr. Levie did not show an interest in acquiring, and targets that I pursued independent of AIAC.

10. The Commission Agreement provided that, when AIAC or an affiliate acquired a target I had presented to AIAC, I generally would receive a cash commission under the "Lehman Formula" and 12.5% equity in the new holding company. For a negative or nominal purchase-price acquisition—like the MB Aerospace Sterling Heights, Inc. ("MB Aerospace") and Kaman Composites – Wichita, Inc. ("Kaman Wichita") acquisitions—AIAC and I were required to negotiate in good faith an alternative commission in cash and equity, and the Commission

Agreement expressly provided that AIAC would not acquire the target unless we had first mutually agreed upon the commission amount. For the MB Aerospace acquisition, no such commission was ever agreed upon or paid.

11. In prior acquisitions where Mr. Levie was interested and wanted AIAC to acquire the target, the terms of our arrangement were documented before closing, including through a written commission agreement and ownership records identifying Levie's interest in the new holding company.

12. On the other hand, when Mr. Levie was not interested in a potential acquisition, we did not enter into a commission agreement, and I could—and did—pursue the opportunity on my own. This occurred on multiple occasions throughout our working relationship.

13. Even where Mr. Levie or AIAC had not yet confirmed an interest in an acquisition or confirmed they wanted to complete the acquisition, I often used my AIAC email account or AIAC branding in preliminary communications with potential acquisition targets because AIAC is used as a marketing vehicle for acquisition activity. In my experience, this is common with brokers that work with AIAC and other similar entities. To my knowledge, AIAC itself owns no operating assets or companies.

14. The particular entity that ultimately acquires a business is often not determined until later in the transaction process and may differ from the entity or name used in preliminary communications. That is a normal part of the acquisition process in my experience, particularly for acquisitions involving a nominal purchase price, such as the MB Aerospace and Kaman Wichita acquisitions. In those transactions, the seller generally is concerned with the agreed transaction terms and the transfer of the business, not which acquisition entity ultimately takes title. Accordingly, in my standard practice, use of AIAC branding or an AIAC email address in communications concerning a potential acquisition did not mean that AIAC itself would necessarily be the entity that acquired the business.

15. In or around 2021, I hired Jonathan Batista as a contractor, and his primary responsibility was to help identify potential acquisition targets. Mr. Batista had very limited experience in the aerospace industry, so I spent substantial time teaching him about the industry and giving him practical experience, including by involving him in due diligence, acquisitions, and visits to operating facilities. Despite those efforts, during the approximately five years that Mr. Batista worked for me, he did not identify a single acquisition target that I ultimately acquired or considered a suitable acquisition opportunity. In my view, Mr. Batista never developed a sufficient understanding of the industry to independently identify appropriate acquisition targets.

16. In early 2026, I terminated my working relationship with Mr. Batista. His poor performance was one reason, but events that came to my attention in 2026 made me unwilling to continue working with him. First, in February 2026, I learned that a former employee of a restaurant owned by Mr. Batista, in which I was an investor, had filed a lawsuit alleging that Mr. Batista had sexually harassed her. I found the allegations disturbing and did not want to associate myself or my businesses with that alleged conduct. *See Ramsingh v. GB Austin Street LLC*, Index No. 705612/2026, Verified Complaint (N.Y. Sup. Ct. Queens Cnty. Feb. 26, 2026), NYSCEF Doc. No. 1. Second, the restaurant's other co-owner and I discovered evidence that Mr. Batista had taken money and perishable inventory from the restaurant without authorization. In light of those events, together with his longstanding performance issues, I terminated Mr. Batista and have not worked with him since.

17. To my knowledge, the first time Mr. Batista began asserting he had an ownership interest in MPG and its subsidiaries was after I terminated him.

## II. THE MB AEROSPACE STERLING HEIGHTS, INC. OPPORTUNITY

18. In February 2022, I shared with Mr. Levie a transaction overview prepared by Houlihan Lokey regarding the acquisition of MB Aerospace.

19. Mr. Levie responded that he wanted to see the balance sheet, noting the "income statement is filled with aggressive adjustments," and otherwise suggested preparing a letter of interest. I did so and he signed the nonbinding letter of intent. Beyond that preliminary step, Mr. Levie was largely unresponsive to follow-up communications. He did not participate or ask to participate in any on-site visit, management interviews, plant walkthroughs, contract review, or other due diligence work leading up to the transaction.

20. In my work with Mr. Levie and AIAC, nonbinding letters of intent and indications of interest were common. They serve as a preliminary step to communicate interest in learning more about an opportunity and did not mean that AIAC had committed to complete an acquisition. Over approximately fifteen years of working with Mr. Levie, we sent hundreds of such preliminary letters for potential acquisitions, only a small fraction of which ultimately resulted in transactions involving Mr. Levie or AIAC.

21. Mr. Batista's role in the MB Sterling Heights, Inc. acquisition was extremely limited and was essentially that of an assistant. I involved him in the process primarily to give him practical experience and help him learn how acquisitions are evaluated and completed so that he could become more effective at identifying potential targets himself. His responsibilities were largely administrative and included tasks such as taking meeting notes, coordinating travel, and making restaurant reservations. He did not meaningfully contribute to the substantive evaluation of the transaction, negotiation of deal terms, or decision making concerning the acquisition.

22. After the initial nonbinding letter of intent, I continued reaching out to Mr. Levie through the closing regarding whether he and AIAC would actually participate in the MB Aerospace acquisition. I sent him transaction materials and proposed ownership structures and repeatedly sought his input and confirmation. I personally performed on-site due diligence in Sterling Heights with multiple site visits and off-site due diligence, I interviewed the management team members, I spoke with all major customers, performed machinery and equipment analysis,

reviewed lease agreements, negotiated all purchase contracts with the seller and more. Mr. Levie never accepted the proposed ownership structure, never agreed with me on a commission, and did not otherwise participate in any diligence or the acquisition.

23. Based on approximately fifteen years of working with Mr. Levie, I observed a consistent pattern in how he approached acquisition opportunities. When Mr. Levie was genuinely interested in a transaction, he became personally and intensely involved: he traveled to target facilities, participated directly in negotiations, communicated frequently and in depth by both email and phone pushing on deal points and due diligence. Even when not physically present, Mr. Levie would provide real-time direction on deal terms during breaks in negotiating sessions.

24. By contrast, when Mr. Levie lacked interest in an opportunity, he generally stopped engaging and often did not respond to correspondence. In my experience, he would rarely if ever state definitively that he was not interested in an acquisition. He would simply become unresponsive. Silence was how Mr. Levie often declined. And that is what he did with the MB Aerospace acquisition.

25. In my experience, Mr. Levie was most engaged in acquisition opportunities that he believed presented immediate financial upside. After receiving the financial information for MB Aerospace , he did not display the level of involvement I had consistently observed when he was committed to an acquisition: he did not visit the facility, participate in negotiations, speak with the seller, interview the management team or reach an agreement with me concerning ownership or the transaction specific commission.

26. During the period surrounding the closing, I continued to seek Mr. Levie's participation and used the proposed ownership structure in communications with him and third parties. Those communications reflected the ownership arrangement I was seeking to put in place if Mr. Levie agreed to participate; they did not reflect a completed agreement admitting him as a member of MPG. No operating agreement or other membership agreement with Mr. Levie or

Mr. Batista was ever executed or agreed to, no MPG membership interest or shares were ever issued or transferred to either of them, and no transaction-specific commission arrangement with AIAC or Mr. Levie was ever reached.

27. My proposed five-percent interest for Mr. Batista was intended as a potential reward for work he had performed and was part of the same proposed ownership structure I was discussing with Mr. Levie. It was contingent on Mr. Levie agreeing to participate in the transaction. I never entered into any agreement with Mr. Batista admitting him as a member of MPG, and no membership interest was ever issued or transferred to him. The amounts I paid Mr. Batista through Skyhawk Capital, LLC ("Skyhawk Capital") were compensation for his work as a contractor, not distributions or other payments arising from a purported ownership interest in MPG.

28. AIAC, Mr. Levie, and I never arrived at a mutually agreeable commission fee for the acquisition of MB Aerospace, and I never received a commission in connection with the acquisition of MB Aerospace. Mr. Levie never had any intent of engaging in commission discussions with me.

## III. FORMATION OF MPG AND ACQUISITION OF MB AEROSPACE STERLING HEIGHTS, INC.

29. On April 13, 2022, I organized Michigan Precision Group, LLC ("MPG") as a Wyoming limited liability company by directing Wyoming EZ Corp, a registered agent service, to file articles of organization with the Wyoming Secretary of State. I personally covered the registered-agent fee and all formation costs, and I was the sole person to authorize Wyoming EZ Corp's appointment as MPG's registered agent. Attached as **Exhibit H** is a true and correct copy of the April 13, 2022, Articles of Organization; **Exhibit I** is a true and correct copy of the April 13, 2022, registered agent consent; and **Exhibit J** is a true and correct copy of the April 13, 2022, payment receipt.

30. At no point during MPG's formation, or at any time since, did MPG adopt a written

operating agreement. Because I was and remain MPG's sole owner and member, I did not consider a written operating agreement necessary.

31. On April 15, 2022, acting on MPG's behalf, I entered into a stock purchase agreement to acquire 14,000 shares of MB Aerospace for a total purchase price of $1.00. On or about April 26, 2022, MB Aerospace was renamed Vital Engineered Components Company, Inc. ("VECCO"). Mr. Levie was not involved in the purchase or rebranding.

32. VECCO's three facilities are located in Sterling Heights, Michigan. VECCO focuses on manufacturing, engineering, quality assurance, and precision machining, producing complex, machined assemblies from both ferrous and non-ferrous metals for the aerospace sector. Its customer base includes Lockheed Martin, Pratt & Whitney America, Pratt and Whitney Canada, Lycoming, and Collins Aerospace.

33. When MB Aerospace was acquired, MPG essentially acquired a manufacturing operation—not a standalone company with the management and administrative infrastructure needed to operate independently. The acquired business consisted principally of its manufacturing facilities, equipment, and existing workforce. It had no human resources department, finance department, or established executive leadership team. After the acquisition, Robert Bell III, Mark Stones and I built that infrastructure. We hired and installed new operational leadership, manufacturing and engineering leadership, staffed human resources, and created and staffed the finance and accounting departments. We also evaluated the existing workforce and floor-level management and retained, replaced, or added managers and personnel as necessary to stabilize and operate the business into a going concern company. Again, neither Mr. Levie nor AIAC were involved in building this company, in any capacity.

34. During that same period, I also wanted Mr. Batista to gain practical exposure to the process of operating and turning around an acquired business because I believed that experience would make him more effective in his role identifying and evaluating future acquisition targets. I

therefore asked Mr. Bell to allow Mr. Batista to spend time at VECCO in a training capacity. Mr. Batista worked under Mr. Bell in that role for approximately three to four months. He was there to observe and learn from the operating team, not to exercise independent management authority or make decisions for the business. He had no ownership or independent management authority over MPG, VECCO, or any of my other companies. Throughout that period, I continued to pay Mr. Batista through Skyhawk Capital; he received no compensation from MPG, its subsidiaries, or VAERO. After his brief period working at the VECCO facility, Mr. Batista performed no further work for VECCO.

## IV. OWNERSHIP AND MANAGEMENT OF MPG

35. Since MPG's formation, I have been its only member and have had exclusive control over its management and financial affairs.

36. I funded MPG's formation and organizational costs personally, including all travel expenses, VECCO brand and website build out, named guarantee on the business bank accounts, startup costs, management team hiring and payment of their salaries and fees, bank and credit negotiations, advisory fees, legal fees and more. I worked tirelessly to guarantee the future of this company in Sterling Heights. I took full financial responsibility and the personal risks associated with acquiring and operating a distressed business, which was extremely close to bankruptcy. Without my acquisition, turnaround and management efforts, VECCO's future would have been bleak. No Plaintiff ever contributed capital to MPG, VECCO, or VECCO Wichita, guaranteed any obligation of those companies, or bore any financial risk associated with them. Had either acquisition failed, no Plaintiff would have lost anything.

37. MPG has never had any employees, office space, manufacturing facility, or business operations in Wyoming.

38. On May 1, 2022, acting as MPG's owner and Managing Partner, I designated myself and Mr. Bell as directors of VECCO under MPG's authority as sole shareholder of VECCO.

39. On April 17, 2023, I filed MPG's annual report with the Wyoming Secretary of State. Attached as **Exhibit K** is a true and correct copy of the April 17, 2023, Annual Report.

40. On May 13, 2024, I filed MPG's annual report with the Wyoming Secretary of State. Attached as **Exhibit L** is a true and correct copy of the May 13, 2024, Annual Report.

41. On behalf of MPG, I filed for an Employer Identification Number, which I received on November 22, 2024. Attached as **Exhibit M** is a true and correct copy of the notification from the IRS, identifying me as the sole member of MPG.

42. Between August 6, 2024, through July 13, 2026, I received and continued to pay registered agent invoices on behalf of MPG. Attached as **Exhibit N** is a true and correct copy of the invoices from Best Wyoming Registered Agent LLC.

43. On February 27, 2025, I submitted a beneficial ownership information report to the Financial Crimes Enforcement Network ("FinCEN") identifying myself as MPG's sole beneficial owner.

44. None of MPG's organizational filings, annual reports, EIN records, registered-agent documentation, or FinCEN reports identifies any Plaintiff as a member, manager, or beneficial owner of MPG.

45. None of the Plaintiffs were involved in or assisted with the formation of MPG, and none of them have ever participated in the management or operation of MPG.

## V. OWNERSHIP AND MANAGEMENT OF MPG'S SUBSIDIARIES

46. From MPG's formation through the present, I executed every stock purchase agreement on behalf of MPG. Attached as **Exhibit O** is a true and correct copy of the April 15, 2022, stock purchase agreement by and among MPG, JMBL, Inc., and MB.

47. From MPG's formation through the present, I executed every stock purchase agreement on behalf of MPG's subsidiary, VECCO, including the agreement for VECCO's acquisition of Kaman Wichita. Attached as **Exhibit P** is a true and correct copy of the August 9,

2024, Stock Purchase Agreement among Kaman Aerospace Group, Inc. ("Kaman Aerospace"), VECCO, and Kaman Wichita.

48. From MPG's formation through the present, I executed every transition services agreement on behalf of MPG's subsidiary, VECCO, including the agreement governing Kaman Aerospace's provision of certain back-office and operational support during the transition following VECCO's acquisition of Kaman Wichita. Attached as **Exhibit Q** is a true and correct copy of the August 9, 2024, Transition Services Agreement by and among Kaman Aerospace, VECCO, and Kaman Wichita.

49. In late November 2023, I sent Mr. Levie a draft nonbinding letter of intent for "Project Falcon," which at that time covered both Kaman Aerospace's Wichita and Jacksonville operations. The preliminary proposal used AIAC/VECCO branding and identified AIAC, through VECCO, as the proposed offeror. It was a preliminary, nonbinding proposal and not a definitive agreement to acquire either business. The Commission agreement was still not discussed amongst Mr. Levie and me.

50. I used AIAC's name and email domain in the early-stage sourcing, confidentiality agreement, and transaction correspondence because of my longstanding brokerage relationship with AIAC and because I was still seeking to determine whether Mr. Levie and AIAC would participate in the transaction and, if so, on what commission terms. My use of AIAC's branding in those preliminary communications was as a marketing tool, and did not indicate or mean that AIAC or Mr. Levie owned MPG or VECCO, or that we had reached a final agreement concerning AIAC's participation in the acquisition.

51. Mr. Levie's involvement in the Kaman Wichita acquisition remained limited to the preliminary, nonbinding letter-of-intent stage. In November 2023, he reviewed and returned edits to a nonbinding letter of intent. When the Kaman Wichita acquisition process resumed in June 2024, I again sent him a proposed nonbinding letter of intent and asked about his interest, and Mr.

Levie signed the June 27, 2024, nonbinding letter of intent. His involvement stopped there. Mr. Levie did not participate in the on-site diligence, negotiate with Kaman Aerospace or its advisors toward the definitive transaction, direct the negotiation of the definitive deal terms, negotiate or execute the Stock Purchase Agreement or Transition Services Agreement, arrange, provide, or guarantee funding, participate in the closing, or participate in VECCO Wichita's management or operations after closing. The work required to diligence, negotiate, close, and operate the acquisition was undertaken by me, Mr. Stones, and the VECCO team, without Mr. Levie's or Mr. Batista's involvement.

52. As discussed above, in prior transactions in which Mr. Levie and AIAC ultimately participated, we separately documented the transaction-specific commission and ownership arrangement, and Mr. Levie became actively involved in completing the previous acquisitions. Neither occurred with Wichita. No commission was ever agreed upon or paid to me in connection with the Wichita acquisition.

53. Following VECCO's acquisition, Kaman Wichita was rebranded to VECCO Wichita.

54. VECCO Wichita is located in Wichita, Kansas. Its core work involves fabricating structural composite assemblies for aircraft.

55. I have managerial oversight over VECCO Wichita, and together with Mr. Bell, am responsible for day-to-day operations of VECCO Wichita through handling supplier relationships, customer issues, inventory management, payroll, and accounts-payable matters.

56. Plaintiffs do not have authority to execute documents on behalf of MPG, or its subsidiaries VECCO and VECCO Wichita.

57. I am the authorized signatory on VECCO's and VECCO Wichita's bank accounts and have directed the financial and operational affairs of both companies.

58. Plaintiffs do not have access to MPG, VECCO, or VECCO Wichita's bank

accounts.

59. At no point have Plaintiffs managed the day-to-day operations of MPG, VECCO, or VECCO Wichita.

60. To date, the stock, physical facilities, equipment, manufacturing processes, employees, and business infrastructure of VECCO and VECCO Wichita remain within MPG's corporate structure. Neither the stock nor assets of VECCO or VECCO Wichita have been transferred to Cendry Capital, VAG, Falcon Jacksonville or any other entity.

## VI. VECCO AEROSPACE GROUP, INC. AND FALCON JACKSONVILLE ARE SEPARATE FROM MPG.

61. VECCO Aerospace Group, Inc. ("VAG") is a Delaware corporation. It is a separate entity from MPG. MPG does not own VAG, and VAG is not a subsidiary of MPG. I own 75% of VAG and Mr. Stones owns the remainder.

62. On November 8, 2024, VAG entered into an equity purchase agreement with Kaman Aerospace Corporation to acquire Falcon Jacksonville, LLC ("Falcon Jacksonville") for a nominal purchase price. I executed that agreement on behalf of VAG. Attached as **Exhibit R** is a true and correct copy. MPG was not a party to that agreement and acquired no interest in Falcon Jacksonville.

63. No Plaintiff holds any ownership interest in VAG or in Falcon Jacksonville, nor participated in the Falcon Jacksonville acquisition, contributed capital to it, or was asked to.

## VII. PLAINTIFFS HAVE NEVER PARTICIPATED IN MPG'S AFFAIRS

64. Prior to the filing of this lawsuit, I had been managing MPG and its subsidiaries without interruption for over four years. Throughout that time, I was responsible for their finances, oversaw their operations, worked with the management team daily on problem solving tasks, negotiated with customers on existing and new contracts, negotiated with landlords, formed new business plans, signed their transaction documents, and acted as the businesses' sole owner.

65. For over four years, up until Plaintiffs' July 2, 2026, demand, Plaintiffs did not ask

me for MPG's operating agreement, membership certificates, capital accounts, Schedule K-1s, member-meeting records, information concerning distributions, or documentation showing that either Mr. Levie or Mr. Batista had been admitted as a member. Nor did they request any member meeting, member vote, distribution, or regular financial reporting concerning MPG or otherwise inquire about its business, employees, or financial condition. In the aforementioned acquired companies I have purchased with Mr. Levie, Mr. Levie would actively seek weekly flash cash reports, 13-week cash flow reports, monthly and annual financial statements.

66. I have reviewed the notice of a special meeting of members of MPG dated August 26, 2026, signed by Mr. Levie as "Majority Member." It would bar MPG, VECCO, and VECCO Wichita from paying, reimbursing, or advancing legal fees for me in this action, in *The Boeing Company v. Falcon Jacksonville*, or in the Kaman litigation; declare any corporate indemnification for me null and void; and declare that Bagby & Associates and Morrison & Foerster "are not and shall not be authorized to represent MPG, VECCO, or VECCO Wichita." It also purports to terminate Mr. Bell and Traci Metzger from their positions effective immediately, without naming any successor.

67. Mr. Levie has never held any position with MPG, VECCO, or VECCO Wichita. To my knowledge, he has never visited their facilities, met their employees, or participated in a meeting with any of their customers or suppliers. Mr. Levie claims to be an owner-operator himself. This statement contradicts his supposed ownership of MPG.

68. Plaintiffs ask this Court to bar me from acting on behalf of MPG, VECCO, or VECCO Wichita in any capacity. And Mr. Levie's August 26, 2026, notice purports to simultaneously terminate Mr. Bell as Chief Executive Officer and Ms. Metzger as Chief Financial Officer of VECCO and VECCO Wichita and revoke Mr. Stones's authority to act for them. Taken together, those actions would remove every person who currently holds decision-making authority over these two companies, at the same time, and would put no one in their place. Neither the

Motion nor the notice identifies a single individual who would run these businesses.

69. I am the authorized signatory on VECCO's and VECCO Wichita's bank accounts, and Ms. Metzger is also an authorized signatory on the same bank accounts. If I am barred from acting and Ms. Metzger is removed, I am aware of no person who would have authority to release payroll, pay suppliers, fund raw material purchases, or satisfy tax and insurance obligations for either company. VECCO and VECCO Wichita employ approximately 150 people whose wages are paid from those accounts.

70. MPG, VECCO, and VECCO Wichita also have significant contracts and relationships with suppliers and customers, which my team and I have built over the last four years, and which include guarantees on performance on concrete deadlines. Those obligations and relationships cannot simply be transferred to Mr. Levie. To my knowledge, no person associated with Plaintiffs has any relationship with these companies' suppliers or customers, and none has ever participated in a discussion with any of them.

71. An interruption of this kind would not be a temporary inconvenience. VECCO and VECCO Wichita are qualified aerospace suppliers operating under customer quality, delivery, long term customer contract agreements, and export-control requirements. An abrupt removal of the individuals currently responsible for management and payment authority would disrupt payroll and supplier payments, delay production and deliveries, and likely prompt customer escalation, supplier audits, or decisions to move work to alternative suppliers, risking the liquidity of the businesses. Skilled machinists, engineers, and quality personnel in these labor markets are difficult to replace, and the loss of experienced personnel or customer work would impair operations well beyond the period of any temporary injunction.

72. Mr. Levie has never operated a business at these facilities, met their employees, or spoken with their customers. He has contributed no capital, guaranteed no obligation, and borne no risk of loss. If VECCO and VECCO Wichita were to fail as a result of the relief Plaintiffs seek,

I would lose the businesses I spent over four years building and their employees would lose their jobs. Mr. Levie would lose nothing.

I declare under penalty of perjury under the laws of the State of Wyoming that the foregoing is true and correct.

DATED this 8th day of September, 2026, at Berwyn, Pennsylvania.

Signed by:
Brandon Stewart
1B21E976F5EC40A...

Brandon Stewart