FILED
9:14 am, 9/30/26
Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

LEONARD LEVIE, et al.,

Plaintiffs

vs.

BRANDON STEWART, et al.,

Defendants.

Case No. 26-CV-240-R

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [5]**

This case centers on the contested ownership and control of two companies and the parent company formed to acquire them. While a range of claims are raised, the ultimate question is one of rightful ownership. As this matter is before the Court on a motion for preliminary injunction, the Court is not yet required to answer that question. Rather, the Court must decide whether Plaintiffs have carried their burden in showing an injunction is appropriate to, among other things, modify control of the contested companies while this case proceeds on the merits. The Court, having carefully reviewed the Motion for Preliminary Injunction, [ECF No. 5], Response in Opposition, [ECF No. 34], and having heard oral argument on September 16, 2026, finds Plaintiffs have failed to carry their burden. The Court therefore denies Plaintiffs' Motion for Preliminary Injunction.

## BACKGROUND

In this section, the Court first briefly summarizes the agreement (the "Commission Agreement") executed in 2011 by Plaintiff American Industrial Acquisition Corporation ("AIAC") and Defendant Brandon Stewart. The Commission Agreement established the professional relationship between AIAC and Mr. Stewart by tasking Mr. Stewart with finding and presenting acquisition prospects to AIAC. The Court then outlines Mr. Stewart's formation of Michigan Precision Group LLC ("MPG") in 2022, and MPG's acquisition of the companies later rebranded as Vital Engineered Components Company, Inc. ("VECCO") and VECCO Wichita in 2022 and 2024, two acquisition opportunities originally presented to AIAC pursuant to the Commission Agreement. The Court then turns to Plaintiffs' recent assertion of majority ownership of MPG, VECCO, and VECCO Wichita, which forms the basis for this litigation. Lastly, before turning to the Motion for Preliminary Injunction presently at issue, the Court discusses the case brought, the claims included, and the various parties named.

**AIAC and the Commission Agreement**

Plaintiff Leonard Levie owns and chairs AIAC, a New York-based industrial holding company that focuses on acquiring and operating manufacturing companies. [ECF No. 6 at 2]. Plaintiff Jonathan Batista serves as the Vice President of AIAC. [ECF No. 6, at 2]. Defendant Brandon Stewart began his association with AIAC in 2011 pursuant to the Commission Agreement, [ECF No. 6, at 2; ECF No. 34, at 12], under which Mr. Stewart would act as a commissioned agent to "actively seek corporate acquisition prospects . . . and present such Target Companies to AIAC for its consideration." [ECF No. 1-5, Ex. 5].

The Commission Agreement further outlines the scope of Stewart's duties as an agent and the structure of Stewart's compensation in the event he originates a successful acquisition. [ECF No. 1-5, Ex. 5].

**VECCO Acquisition**

Mr. Stewart, on behalf of AIAC, reached out to investment firm Houlihan Lokey in February 2022 regarding AIAC's interest in acquiring certain Michigan operations of the company MB Aerospace. [ECF No. 1, Ex. 6]. Later that month, Mr. Stewart relayed information regarding a potential acquisition of MB Aerospace Sterling Heights, Inc. to Mr. Levie, noting that it may be available at a nominal purchase price. [ECF No. 1-7, 1-8]. In response, Mr. Levie expressed interest in the transaction and requested additional information and the preparation of a non-binding letter of intent ("LOI"). [ECF No. 1, Ex. 9]. On March 15, 2022, Mr. Stewart forwarded an LOI to Mr. Levie, requesting his review and comment before sending to Houlihan Lokey. [ECF No. 1, Ex. 10]. Later that day, Mr. Stewart followed up and again requested Mr. Levie's feedback on the LOI. [ECF No. 1, Ex. 11]. Without receiving a reply, Mr. Stewart sent the LOI to Houlihan Lokey on behalf of AIAC the next day. *See id*.

From that point on, Defendants claim, Mr. Levie remained largely passive and unresponsive with respect to the acquisition of MB Aerospace Sterling Heights, Inc. [*See* ECF No. 34 at 13]. In contrast, according to Defendants, Mr. Stewart actively pursued and participated in the acquisition effort through on- and off-site due diligence, interviews with management, and negotiation of all purchase agreements, among other things. [ECF No. 34, at 15]. On April 8, 2022, Mr. Stewart sent Mr. Levie a proposed ownership structure

for the new company which suggested an equity apportionment of 75% for Mr. Levie, 20% for Mr. Stewart, and 5% for Mr. Batista. [ECF No. 1-2, Ex. 2]. Mr. Levie did not respond to or confirm the structure. [ECF No. 1-2, Ex. 2].

In anticipation of closing on April 15, 2022, Mr. Stewart formed a new entity, MPG, which would act as the parent company for the newly acquired MB Aerospace Sterling Heights, Inc. [ECF No. 34, at 13]. No written operating agreement was executed in connection with the formation of MPG or thereafter. *Id*. Mr. Stewart also sent Mr. Levie a draft of the stock purchase agreement, inviting final questions and noting that he would sign on Mr. Levie's behalf. [ECF No. 1, at 22]. The record indicates that Mr. Levie did not reply. *See id.*; [*see also* ECF No. 34, at 13].

On the day of closing, Mr. Stewart signed a stock purchase agreement on behalf of MPG to purchase 14,000 shares of MB Aerospace for the price of $1.00. *Id*. at 13. MB Aerospace was then rebranded as VECCO. *Id*.

Following the acquisition on April 15, 2022, Mr. Stewart, along with Defendant Robert Bell III, began managing the day-to-day operations of MPG and its subsidiary VECCO. *Id*. at 14. According to Defendants, Mr. Stewart "executed acquisition and operating documents, managed company finances and operations with Bell, and acted as the person authorized to bind the business." *Id*. Defendants offer a range of records highlighting Mr. Stewart's ownership and control, including Mr. Stewart's filing of annual reports on behalf of MPG and his payment of registered agent invoices. *See id*. at 14.

**VECCO Wichita Acquisition**

In November 2023, Mr. Stewart received a pitch from an analyst at Houlihan Lokey for the purchase of three businesses owned by Kaman Aerospace Group, Inc. [ECF No. 4, at 30]. The outreach was addressed to Mr. Stewart's AIAC email. *Id*. In response, Mr. Stewart prepared and signed a confidentiality agreement on behalf of AIAC. *Id*. Later that month, Mr. Levie edited, approved, and sent back to Mr. Stewart a non-binding LOI for the purchase of Kaman Composites facilities in both Wichita, Kansas, and Jacksonville, Florida. *Id*. The LOI identified the purchaser as "AIAC or its affiliate, VECCO" and was signed by Mr. Stewart, Mr. Levie, Mr. Batista, and Mr. Bell. [ECF No. 1-27, Ex. 27]. Apart from Mr. Bell, each signatory named AIAC in their signature block. *Id*. In June 2024, AIAC, "through its affiliate," VECCO, submitted an updated non-binding LOI for the purchase of only Kaman Composites – Wichita, Inc., excluding the facility in Jacksonville from the scope of the acquisition. [ECF No. 1-45, Ex. 45]. The same signatories appeared on the updated version. *Id*.

On August 9, 2024, VECCO acquired Kaman Composites – Wichita, Inc. pursuant to a stock purchase agreement executed by Mr. Stewart. [ECF No. 34-18, Ex. P]. The company was subsequently rebranded as VECCO Wichita. [ECF No. 34, at 16]. Following the acquisition, Defendants maintain, Mr. Stewart and Mr. Bell "assumed responsibility for [VECCO Wichita's] operations, including suppliers, customer disputes, inventory, payments, and accounts-payable issues." *Id*. Along with VECCO, Mr. Stewart and Mr. Bell proceeded to manage VECCO Wichita as another portfolio company of MPG. *See id*.

**Plaintiffs Contest Ownership of MPG, VECCO, and VECCO Wichita**

The record indicates that MPG, VECCO, and VECCO Wichita proceeded with business as usual under the control and management of Mr. Stewart until June 2026. [*See* ECF No. 34, at 14–16]. On June 10, 2026, Mr. Stewart announced his departure from AIAC and, on June 11, 2026, launched a website for his new investment group, Cendry Capital, Inc. ("Cendry"). [ECF No. 1, at 35–36]. On June 16, 2026, Cendry published a press release on its website announcing its launch. *Id*. at 36. The press release named VECCO as one of Cendry's portfolio companies. *Id*.

Shortly thereafter, on July 2, 2026, Plaintiffs' counsel sent a letter to Mr. Stewart demanding to inspect and copy the books and records of MPG and its related entities. [ECF No. 1-35, Ex. 35]. The letter asserted that Mr. Levie is the majority member of MPG, and "the sole, 100% shareholder" of VECCO. *Id*. On July 8, Mr. Levie sent written notice of a purported "Special Meeting of the Members of MPG" to Mr. Batista and Mr. Stewart. [ECF No. 1-38, Ex. 38]. VECCO's CEO, Mr. Bell, and CFO, Traci Metzger, were invited to attend and provide a summary of financial records and transactions of MPG. [ECF No. 1, at 38].

On July 20, 2026, only Mr. Levie and Mr. Batista attended the purported members' meeting. *See id*. Asserting that their presence as majority members constituted a quorum, Mr. Levie and Mr. Batista "adopted resolutions directing management to produce a complete schedule of membership interests, engage independent auditors, authorize investigation of Stewart's conduct, remove Stewart from management, and appoint Levie as managing member." *Id*. at 38–39. Plaintiffs' counsel emailed a copy of the "Adopted

Resolutions" to counsel for Mr. Stewart and MPG, along with a demand for documents corroborating Mr. Stewart's ownership. *Id*. at 39.

**Plaintiffs File Suit**

Receiving no response to their email and demand for documents, Plaintiffs filed this action in August 2026. Among many claims directed at various parties, Plaintiffs maintain that "the primary and most urgent . . . is the dispute over ownership of MPG." [ECF. No. 1, at 41].

***Ownership of MPG, VECCO, and VECCO Wichita***

Plaintiffs contend that majority ownership and control of MPG rightfully rest with Mr. Levie and Mr. Batista. *Id*. at 7. In support, Plaintiffs cite correspondence and representations from and around the time of the VECCO acquisition. [*See* ECF No. 1, at 16–28]. In particular, Plaintiffs highlight the proposed ownership structure diagram created and circulated by Mr. Stewart, which allocated 75% ownership to Mr. Levie, 5% to Mr. Batista and 20% to Mr. Stewart. See *id.*; [ECF No. 1-16, Ex. 16]. According to Plaintiffs, the diagram correctly represents the parties' respective ownership interests in MPG. [ECF No. 1, at 7].

Additionally, Plaintiffs cite an array of emails and documents circulated by Mr. Stewart from and after the VECCO acquisition through the VECCO Wichita purchase, variously naming Mr. Levie or AIAC as owners or affiliates of MPG and VECCO. *See, e.g.*, *id.* at 7–9, 25–27. These include, among other things, emails stating that Mr. Stewart was acting on behalf of Mr. Levie in the VECCO acquisition, that "AIAC acquired the Sterling Heights division of MB Aerospace," and that "Leonard Levie owns [MPG]." *Id*.

at 23, 26, 27. Plaintiffs also emphasize that the proposed ownership structure diagram was sent not only to Mr. Levie, but also sent and represented to a range of third parties following the acquisition of VECCO. *Id*. at 7–8.

Defendants contend that the diagram, along with other cited emails and representations from or by Mr. Stewart, were in anticipation of an agreement, but that an explicit agreement was never reached. [ECF No. 34, at 13]. Defendants argue this is conclusive: mutual agreement is a condition precedent for shared ownership under the Commission Agreement. *See id*. Defendants point to Mr. Stewart's original email to Mr. Levie attaching the diagram, which contained "language seeking agreement, not recording an already executed operating agreement." *Id*. With respect to Mr. Stewart's continued use of the AIAC name, Defendants counter that it was merely utilized for marketing purposes and was not a reflection of true ownership. *Id*. at 12.

Defendants also assert that Plaintiffs were not involved in the ownership, management, or operation of MPG, and underscore Mr. Stewart's continued day-to-day management, record authority, and established relationship with VECCO executives since the formation of MPG. *Id*. at 14–15. In contrast, "Plaintiffs do not appear once in any of these records." *Id*. at 14. Defendants contend that "[i]n more than four years, no Plaintiff cast a member vote, took a distribution, received a K-1, attended a meeting, approved a budget, directed an employee, or exercised authority over a customer or supplier" and that Mr. Levie "never visited a facility or met a customer." *Id*. at 15. "The financial records," Defendants offer, "are equally empty." *Id*. Accordingly, Defendants argue that ownership of MPG rests solely with Mr. Stewart. *Id*.

***Related Federal and State Law Claims***

Ownership of MPG, though, is not the only issue in this case. Plaintiffs include federal causes of action for violation of both the Defend Trade Secrets Act ("DTSA") and the Lanham Act. [ECF No. 1, at 54]; 18 U.S.C. § 1836; 15 U.S.C. § 1051 et seq. Plaintiffs allege that Defendants misappropriated trade secrets in violation of the DTSA "by wrongfully transferring VECCO and VECCO Wichita . . . without authorization" and violated the Lanham Act through unauthorized use of the VECCO name. *Id*. at 49, 54. Related state law claims include usurpation of a corporate opportunity and breach of fiduciary duty. *Id*. at 53–54, 60–61.

***Additional Named Defendants***

With respect to the federal causes of action and related state law claims, Plaintiffs name as defendants a number of other entities owned by or affiliated with Mr. Stewart. [ECF No. 1]. These include VECCO Aerospace Group, Inc. ("VAG, Inc."), Falcon Jacksonville, LLC ("Falcon Jacksonville"), Vaero Aerospace Corporation ("VAERO"), and Skyhawk Capital, LLC ("Skyhawk"). *Id*.

VAG, Inc. was formed independently by Mr. Stewart in October 2024 for the purpose of acquiring Falcon Jacksonville, the Kaman Composites – Jacksonville business. [*See* ECF No. 1, at 14; ECF No. 34, at 14]. Though acquisition of Falcon Jacksonville had been initially contemplated alongside the purchase of Kaman Composites – Wichita, Inc., it was ultimately omitted from the final LOI in June 2024. *Id*. Falcon Jacksonville was instead acquired independently by Mr. Stewart through VAG, Inc. in November 2024. *Id*. Once acquired, Falcon Jacksonville began doing business as VAERO. [ECF No. 1, at 15].

Plaintiffs claim that the opportunity to purchase Falcon Jacksonville was rightfully presented to AIAC and usurped by Mr. Stewart through VAG, Inc. [ECF No. 1, at 53]. Unlike MPG and its subsidiaries VECCO and VECCO Wichita, Plaintiffs do not make claims for ownership of VAG, Inc., Falcon Jacksonville or VAERO.

Skyhawk is a Wyoming LLC formed independently by Mr. Stewart in April 2012. *Id*. at 13. Plaintiffs claim, on information and belief, that Mr. Stewart and Mr. Bell "have extracted funds and continue to receive money from invoices issued by Skyhawk[] to VECCO and VECCO Wichita." *Id*. Similarly to the entities named above, Plaintiffs do not make a claim for Skyhawk's ownership.

**Plaintiffs' Motion for Preliminary Injunction**

Concurrently with filing of the Complaint, Plaintiffs submitted a Motion for Preliminary Injunction and Appointment of a Special Master to Select Counsel for Defendant MPG. [ECF No. 5]. The Motion for Appointment of a Special Master was addressed and denied in a separate Order. [ECF No. 48]. Plaintiffs argue a preliminary injunction is necessary to, among other things, prevent active misappropriation of trade secrets, avoid market confusion, and prevent dissipation of assets. [ECF No. 1, at 61; ECF No. 6, at 17–19].

Defendants not only contest the Motion on substantive grounds, but also raise a threshold question as to whether Plaintiffs have established jurisdiction and venue sufficiently such that an injunction should issue.

***Jurisdiction and Venue***

Plaintiffs state that subject matter jurisdiction exists under 28 U.S.C. § 1331 given the federal claims under the DTSA and Lanham Act. [ECF No. 1, at 15]; 18 U.S.C. § 1836; 15 U.S.C. § 1051 et seq. Plaintiffs claim supplemental jurisdiction exists for related state-law claims under 28 U.S.C. § 1367. *Id*. at 16. Further, Plaintiffs state that venue is proper in the District of Wyoming as "Defendant MPG resides in this district and its ownership is the heart of the issues to be resolved." *Id*.

In response, Defendants raise a challenge as to whether the Court may exercise jurisdiction over the majority of Defendants and whether venue is proper in the District of Wyoming. [ECF No. 34, at 20–21]. Defendants argue that the only connection to Wyoming results from MPG's and Skyhawk's registration in Wyoming, and that these contacts are insufficient with respect to the other named Defendants: Mr. Stewart is domiciled in Pennsylvania, Mr. Bell is domiciled in Idaho, VAG, Inc. and Cendry are Delaware corporations, and Falcon Jacksonville operates in Florida. *Id*. at 20. Further, the conduct at issue occurred in Michigan, Kansas, Florida, Delaware, and Puerto Rico. *Id*.

The Court will begin by addressing the challenge to jurisdiction and venue before turning to the merits of the preliminary injunction.

## RELEVANT LAW

"In measuring an application for a preliminary injunction, the Court must first determine if [the] plaintiff has adequately set forth jurisdiction and venue when it is challenged." *U.S. Golf Ass'n v. U.S. Amateur Golf Ass'n*, 690 F. Supp. 317, 319 (D.N.J. 1988).

To establish personal jurisdiction over a non-resident defendant, a plaintiff must show jurisdiction is proper under state law and comports with due process. *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). Wyoming's long-arm statute allows jurisdiction on any basis consistent with the state and federal constitutions. *Medina v. Four Winds Int'l Corp.*, 111 F. Supp. 2d 1164, 1166 (D. Wyo. 2000) (citing Wyo. Stat. § 5-1-107(a)). Thus, the personal jurisdiction analysis in Wyoming collapses into a single due process inquiry, requiring that a defendant have sufficient minimum contacts with the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Id.*; *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Personal jurisdiction must be established defendant by defendant. *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014).

"Venue is . . . the appropriate district court in which to file an action." *Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC*, 333 F. Supp. 3d 1179, 1206 (D.N.M. 2018) (quotations and citation omitted).Venue is proper in the District of Wyoming when (1) all defendants reside in Wyoming; (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated in Wyoming; or (3) if there is otherwise no district in which an action may be brought under (1) and (2), any defendant is subject to personal jurisdiction in Wyoming. 28 U.S.C. § 1391(b)(1)–(b)(3) (2026). "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in [28 U.S.C.] § 1391(b) . . . if it does not, venue is improper." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for*

*W. Dist. of Tex.*, 571 U.S. 49, 56 (2013). Further, "[t]he plaintiff has the burden to demonstrate that the chosen forum is proper when venue is challenged." *Nelson v. Melvin*, No. 1:08CV097TC, 2009 WL 1324063, at *2 (D. Utah May 11, 2009).

Once jurisdiction and venue are established, the decision to grant or deny the extraordinary remedy that is a preliminary injunction is reserved to the sound discretion of the trial court. *See ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 773 (10th Cir. 2011). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier v. Univ. of Col.*, 427 F.3d 1253, 1267 (10th Cir. 2005). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Id*. at 1258 (quoting *SCFC ILC, Inc. v. Visa USA, Inc*., 936 F.2d 1096, 1098 (10th Cir.1991)). Courts have to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *United States Sec. & Exch. Comm'n v. Ameristar, LLC*, No. 24-CV-169-KHR, 2024 WL 4953425, at *2 (D. Wyo. Sept. 9, 2024). In doing so, courts use a four-prong test to determine whether a party is entitled to a preliminary injunction. *Id*.; *see also Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 797 (10th Cir. 2019).

First, the moving party must show a substantial likelihood of success on the merits. *Id.* Second, the moving party would suffer irreparable harm if the motion is denied. *Id*. Third, the threatened injury outweighs the opposing party's injury if the injunction is granted. *Id*. Last, the moving party must show that granting the injunction is not contrary to public interest. *Id.* The consideration of these elements rests within a district court's

discretion and is only overturned for an abuse of that discretion. *Id.* at 796. "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* Factual findings are reviewed for clear error, and legal conclusions are reviewed de novo. *Id.* at 796–97. In addition to the four elements addressed above, a movant seeking injunctive relief must establish a relationship between the claimed injury and the conduct asserted in the complaint. *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010).

Additionally, the Tenth Circuit has recognized "three types of specifically disfavored preliminary injunctions." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd sub. nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *Free the Nipple-Fort Collins*, 916 F.3d at 797. Those types are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro*, 389 F.3d at 976. Preliminary injunctions that fall into one of these categories are subject to a heightened burden. *Id*. That heightened burden requires "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro*, 389 F.3d at 976; *Free the Nipple-Fort Collins*, 916 F.3d at 797.

## RULING OF THE COURT

For the reasons set forth below, the Court denies Plaintiffs' Motion for Preliminary Injunction.

**I. Jurisdiction and Venue**

Defendants contend that Plaintiffs have failed to establish personal jurisdiction over Mr. Stewart, Mr. Bell, VAG, Inc., Falcon Jacksonville, VAERO, and Cendry, and that venue is improper in the District of Wyoming. The Court agrees on both fronts.

***A. Personal Jurisdiction***

As noted above, the personal jurisdiction analysis in Wyoming requires that a non-resident defendant have sufficient minimum contacts with the state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Four Winds*, 111 F. Supp. 2d at 1166. To establish personal jurisdiction in Wyoming, Plaintiffs appear to rely wholly on the connection of MPG and Skyhawk, the only Wyoming contacts referenced in any filing.[1] Importantly, though, "personal jurisdiction over a limited liability company does not automatically extend to its members, as membership in an LLC is not sufficient in-and-of itself to confer personal jurisdiction over its members . . . . Instead, the members must have the requisite minimum contacts with the forum state independently of the limited liability company." *Credit Sage LLC v. Credit Wellness LLC*, No. 1:23-CV-110-SWS, 2024 WL 99474, at *17 (D. Wyo. Jan. 9, 2024) (citation modified). Accordingly, while personal jurisdiction over MPG and Skyhawk is uncontroverted, Plaintiffs must show that the remaining Defendants have contacts with the state beyond their mere affiliation with or membership in the Wyoming entities. As the most direct contact with Wyoming results from Mr. Stewart's formation of MPG and Skyhawk, the

[1] Plaintiffs have offered no other independent basis for establishing personal jurisdiction over Mr. Stewart, Mr. Bell, VAG, Inc., Falcon Jacksonville, VAERO, and Cendry.

Court will begin by analyzing whether these contacts are sufficient to establish personal jurisdiction.

Personal jurisdiction may be general or specific. *See Kuenzle v. HTM Sport-Und Freizeitgerate AG,* 102 F.3d 453, 455 (10th Cir. 1996). Because Mr. Stewart is a non-resident and is not "essentially at home" in Wyoming for purposes of establishing general personal jurisdiction,[2] Plaintiffs must instead rely on the Court's exercise of specific jurisdiction. [*See* ECF No. 34, at 11]; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

"Specific jurisdiction requires that the defendant "purposefully directed" its activities toward the forum jurisdiction and where the underlying action is based upon activities that arise out of or relate to the defendant's contacts with the forum." *Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996). This is a two-prong test: "[t]he contacts must reflect purposeful availment *and* the cause of action must arise out of those contacts." *Kuenzle*, 102 F.3d at 456.

Here, apart from formation of MPG and Skyhawk, the payment of related fees, or maintenance of a mailing address, it is not alleged that Mr. Stewart took any action whatsoever in Wyoming. While Mr. Stewart may meet the purposeful availment prong through formation of entities in Wyoming, Plaintiffs offer no evidence to infer that the second prong is met, as the underlying action is plainly not "based upon activities that arise out of or relate[] to [his] contacts with [Wyoming]." *Knowles*, 87 F.3d at 418. The

[2] Plaintiffs note, and Defendants concede, that MPG and Skyhawk are residents of Wyoming and therefore subject to general personal jurisdiction in the state. Plaintiffs rightly do not appear to suggest that general jurisdiction exists over the remaining Defendants, as none are alleged to be "essentially at home" in Wyoming.

underlying action, centering on the disputed ownership of businesses situated in Michigan and Kansas, does not, in any meaningful sense, arise out of or relate to Mr. Stewart's formation of MPG in Wyoming.

Tenth Circuit precedent makes this clear: "the requirement that the claim arises out of or results from the forum-related activities is not satisfied when the plaintiff would have suffered the same injury even if none of the defendant's forum contacts had taken place." *Kuenzle*, 102 F.3d at 456–57 (citation modified). In this case, Plaintiffs would suffer the same injury irrespective of whether Mr. Stewart formed MPG in Wyoming. Nothing in the record suggests that Mr. Stewart's contacts with Wyoming had even a marginal impact on the events leading to this litigation. Thus, specific jurisdiction is not established as to Mr. Stewart. Moreover, if Mr. Stewart's connection to Wyoming is too attenuated, then Mr. Bell's mere affiliation with an MPG subsidiary and the remaining entities' affiliation with Mr. Stewart or MPG would certainly not suffice.

If this analysis were not clear enough, the Wyoming Chancery Court has recently had occasion to analyze personal jurisdiction under a materially similar set of facts. *See Frankel v. Guardian Law*, No. CH-2024-000009 (Wy. Ch. Oct. 15, 2024). In *Frankel*, a Florida resident had teamed up with a Washington, DC entity to purchase a medical practice in Kansas using two Wyoming LLCs. *Id*. at ¶¶ 4–7. The DC entity was comprised of members from Florida and Maryland. *Id*. The only connection to Wyoming was that the defendant, at the request of the plaintiff, formed the two Wyoming LLCs that would be used to purchase the Kansas medical practice. *Id*. at ¶ 10. When the relationship between Plaintiffs and Defendants deteriorated, Plaintiffs brought suit in Wyoming. *Id*. at ¶ 17.

The Chancery Court dismissed the complaint for lack of personal jurisdiction, holding that "[p]laintiffs have not shown that defendants established sufficient contacts with the State of Wyoming." *Id*. at ¶ 32. Though finding material that the plaintiff directed the defendant to form the LLCs in Wyoming, the Chancery Court continued on to state that "even if [the founding member's] participation as organizer could be attributed solely to [her], filing an LLC with the secretary of state is an attenuated connection with Wyoming—an insufficient contact to support personal jurisdiction." *Id*. at ¶ 34. As to the two non-organizing members, the Chancery Court reaffirmed that "jurisdiction over an LLC in Wyoming does not extend to jurisdiction to its members." *Id*. at ¶ 33.

Taken together, personal jurisdiction in Wyoming demands more than mere formation of an LLC, payment of fees, or use of a mailbox in the state. So, while personal jurisdiction over MPG and Skyhawk is undisputed, Plaintiffs have not carried their burden in establishing personal jurisdiction over Mr. Stewart, Mr. Bell, VAG, Inc., Falcon Jacksonville, VAERO, or Cendry. The Court thus lacks authority to grant the injunctive relief sought for lack of personal jurisdiction.

***B. Venue***

Even if Plaintiffs could establish personal jurisdiction over each of the non-resident Defendants, they have not shown that venue is proper in the District of Wyoming under 28 U.S.C. § 1391(b) such that an injunction should issue. To establish venue, three independent bases are enumerated under § 1391(b), and only one is required for venue to be proper. Plaintiffs argue that § 1391(b) is satisfied "because Defendant MPG resides in this district and its ownership is the heart of the issues to be resolved." [ECF No. 1, at 16].

Plaintiffs also reference Skyhawks' Wyoming residence in support. *Id*. The Court finds that Plaintiffs have failed to make the requisite showing.

First, § 1391(b)(1) provides that a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." While MPG and Skyhawk reside in Wyoming, none of the other Defendants do. And so Plaintiffs cannot rely on § 1391(b)(1).

Second, § 1391(b)(2) permits an action in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Plaintiffs have presented no evidence that any event or omission occurred in Wyoming, or that any of the contested property is situated in Wyoming, much less "a substantial part." The conduct at issue occurred in Michigan, Kansas, and Florida; VAG, Inc. and Cendry, the challenged entities, were formed in Delaware; the claimed property is situated in Michigan and Kansas; and the alleged representations were directed to third parties, none of which resides in Wyoming. No property exists in Wyoming, and no operative event took place or is alleged to have taken place in Wyoming. While a number of districts appear to meet the requirements set out in § 1391(b)(2), Wyoming is not one of them.

Lastly, § 1391(b)(3) provides a fallback: "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." Plaintiffs do not assert, nor could they justify asserting, that there is no other venue proper

under § 1391(b)(2). Accordingly, Plaintiffs have not carried their burden in establishing that venue is proper under 28 U.S.C. § 1391(b) such that an injunction should issue.

**II. Motion for Preliminary Injunction**

Even if Plaintiffs could make the requisite showing for personal jurisdiction and venue, their Motion fails on the merits. As Plaintiffs' preliminary injunction would alter the status quo, it is historically disfavored and requires Plaintiffs to "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in [their] favor." *George Washington Home Owners Ass'n, Inc. v. Widnall*, 863 F. Supp. 1423, 1425 (D. Colo. 1994). Under both the heightened and ordinary burden, Plaintiffs have not made the requisite showing of irreparable harm and have not shown that the balance of harms and public interest weigh in their favor. The Court, therefore, finds that relief is not justified under the four-prong test for a preliminary injunction.

***A. Plaintiff's Burden***

As stated above, certain historically disfavored preliminary injunctions require the movant to satisfy a heightened burden. *O Centro*, 389 F.3d at 976. These include: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Id*. at 976. "[A]ny preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id*. at 975. Further, "[w]hen a preliminary injunction is a disfavored one, the movant 'must make a strong showing both with regard to the likelihood of success on

the merits and with regard to the balance of harms.'" *Id*. at 976. Plaintiff's requested preliminary injunction is disfavored as one that would alter the status quo.

The status quo is the "last peaceable uncontested status existing between the parties before the dispute developed." *Schrier*, 427 F.3d at 1260. "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). Here, the "last peaceable uncontested status" predated the Plaintiffs first demand letter on July 2, 2026.

The record establishes that Mr. Stewart has been at the helm of MPG and its subsidiaries for over four years. According to Defendants, in that time Mr. Stewart "executed acquisition and operating documents, managed company finances and operations with Bell, and acted as the person authorized to bind the businesses." [ECF No. 34, at 14]. It is also undisputed that Mr. Stewart managed the day-to-day operations of the business since formation. *Id*. Conversely, Plaintiffs make no claim to have had any involvement in the management of MPG from April 2022 through July 2026. The record, therefore, plainly shows that the last "peaceable uncontested status before the dispute developed" was Mr. Stewart's uninterrupted management and control of MPG. *See Schrier*, 427 F.3d at 1260. Plaintiffs' actions purporting to displace the longstanding management structure do not change that calculus. Asserting an ownership right by purporting to adopt resolutions shortly before commencement of litigation does not impact analysis of the "last uncontested status." *See* Schrier, 427 F.3d at 1260.

The question, then, is whether the injunction would serve to alter the status quo. Although a range of requests are enumerated, Plaintiffs characterize their injunction as one that "merely preserves the status quo—requiring the parties to maintain MPG's assets intact pending adjudication of ownership." [ECF No. 6, at 20]. But the injunction would go much further. As pleaded, Plaintiffs' injunction would also include, at least, a prohibition on using the VECCO name, allowing access to the books and records of MPG, and requiring approval before payment of invoices from Skyhawk. [ECF No. 1, at 62–63]. Plaintiffs do not attempt to square these requests with preservation of the status quo.

Even setting aside these additional requests to focus solely on protection of MPG's assets, Plaintiffs' injunction would encompass an untenably broad, ill-defined range of conduct incompatible with maintenance of the status quo. This would include "any actions that would transfer, encumber, dilute, dissipate or otherwise diminish Plaintiffs' claimed membership interest." [ECF No. 1, at 61–63]. Would prohibited actions include making payroll? Fulfilling customer contracts? As requested, it appears that nearly any managerial action taken by Defendants could fall under Plaintiffs' stated rubric. Plaintiffs do not endeavor to explain or specify the assets to be protected, nor how such an injunction would, in practice, "merely preserve the status quo."

The Court finds that, as requested, an injunction would plainly alter the status quo. Thus, Plaintiffs will need to satisfy a heightened burden to succeed on their request for a preliminary injunction.

***B. Factors for a Preliminary Injunction***

Plaintiffs, as the party seeking a preliminary injunction, must demonstrate four factors: 1) a substantial likelihood of success on the merits; 2) irreparable harm; 3), the threatened injury outweighs the opposing party's injury if the injunction is granted (balance of the harms); and 4) the injunction is not contrary to public interest. *See Free the Nipple-Fort Collins*, 916 F.3d at 797.

The Tenth Circuit has held that a showing of probable irreparable harm is the single most important factor to consider before issuing a preliminary injunction. *Hunter v. Hirsig*, 614 F. App'x 960, 962 (10th Cir. 2015). Consequently, "the [Plaintff] must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id*. The Court will, therefore, begin its analysis by evaluating the potential for irreparable harm.

*1. Irreparable Harm*

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. So. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation modified). "[M]erely serious or substantial" harm is not irreparable harm." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir.1976)). Further, "the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman*, 348 F.3d at 1189 (quoting *Prairie Band*, 253 F.3d at 1250 (citation modified). "It is well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm."

*Schrier*, 427 F.3d at 1267 (10th Cir. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985)). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiffs present a laundry list of "multiple, concurrent forms of irreparable harm" that they claim to face absent an injunction: active misappropriation of trade secrets, dissipation of assets, market confusion from trademark infringement, jeopardized International Traffic in Arms Regulation ("ITAR") compliance, loss of operating control, and Mr. Stewart's "demonstrated willingness to take reckless action." [ECF No. 6, at 19]. Plaintiffs contend that monetary damages would be insufficient here "because monetary damages alone cannot adequately compensate for the loss of ownership and control of operating businesses, the misappropriation of trade secrets and proprietary information, the potential dissipation or further transfer of Company assets, and the ongoing reputational harm or market confusion." [ECF No. 1, at 62]. But a list of bald, speculative, and conclusory statements is not enough. Though Plaintiffs enumerate wide-ranging harms, none are particularized or substantiated with even minimal factual support. Without more, the Court finds that Plaintiffs have not made a requisite showing of irreparable harm.

First, the harms Plaintiffs allege are speculative. Instead of "certain, great, actual" injury, Plaintiffs offer, without support or substantiation, only broad, conclusory statements which appear theoretical on their face. *See Heideman*, 348 F.3d at 1189. They do not venture to explain the harm inherent in their loss of ownership or control, nor do they identify with any level of particularity the proprietary information or trade secrets at risk

of misappropriation. They do not name a single asset at risk of dissipation, transfer or encumbrance, or attempt to buttress their claims with any compelling supporting evidence.

As an acute example, Plaintiffs allege that "[e]ach day without injunctive relief allows further transfer, encumbrance, or dissipation of MPG assets worth in excess of $50 million." [ECF No. 6, at 17]. Despite the weighty allegation, Plaintiffs do not point to a single asset that they believe to have been dissipated or one at risk of dissipation. Instead, they proceed to allege that Mr. Stewart is mismanaging MPG's assets, including by "defaulting on contractual obligations and demanding increased payments from customers for performance of contracts." *Id*. Even taking these allegations as true, it's not clear how this conduct demonstrates an intent to transfer, encumber, or dissipate assets, and Plaintiffs provide no meaningful throughline. Moreover, the only seemingly specific conduct alleged by Plaintiffs—Mr. Stewart's default on contractual obligations and demand for increased payments—was made with respect to Falcon Jacksonville, whose ownership and control is decidedly not at issue here. *Id*.

The closest Plaintiffs reach to a substantiated, concrete injury is the potential for market confusion and the impact on the reputation and credibility of AIAC. *See id*. at 17. But Plaintiffs identify no interrupted business, no connection in jeopardy, and no tangible or threatened loss. Plaintiffs only aver that "Customers of AIAC . . . have called . . . concerning Stewart's conduct" and that "[Boeing] requested assistance with regard to Falcon Jacksonville's supply of critical components." [ECF No. 1, at 62]. Even assuming Boeing executives or other customers were confused by questions of ownership, Plaintiffs

do not indicate a customer relationship in jeopardy or describe how the confusion has had, or may have, an impact on other AIAC businesses.

In support of their claim for market confusion, Plaintiffs offer a single citation to *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.* for the proposition that "[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm." [ECF No. 6, at 18]; *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,* 736 F.3d 1239, 1250 (9th Cir. 2013). Quoted directly, though, *Herb Reed* states that loss of control "*could* constitute irreparable harm." *Id*. (emphasis added). After acknowledging as much in their decision, the Ninth Circuit continued on to state that evidence in the record was insufficient for a showing of harm and "simply underscore[d] customer confusion, not irreparable harm." *Id*. The distinction is instructive. Ultimately, the Ninth Circuit held that the district erred "by relying on "'unsupported and conclusory statements regarding harm [Plaintiff] *might* suffer,'" a fitting admonition for this case. *See id*.

Neither are Plaintiffs' other supporting arguments persuasive. To the extent Plaintiffs rely on alleged threats to ITAR compliance, potential misappropriation of trade secrets, or loss of operating control, the Court finds that they have not carried their burden in showing how these would result in "certain, great, [or] actual" injury. *See Heideman*, 348 F.3d at 1189. Broad, conclusory statements regarding harm will not suffice. *See Herb Reed*, 736 F.3d at 1250.

Second, Plaintiffs' purported harm cannot justifiably be considered imminent. Defendants point out—and Plaintiffs do not dispute—that until July 2026, Mr. Levie and Mr. Batista had taken no ownership interest, distribution, or managerial role in the four

years since the formation of MPG and acquisition of VECCO. [ECF No. 34, at 8]. If control, reputation, and protection of proprietary information, trade secrets, and assets were of such immediate concern to Plaintiffs, it is unclear why they would have waited four years to attempt any involvement in MPG's businesses. And if the purported transfer of MPG's assets to Cendry demanded immediate action, it is not apparent why Plaintiffs would wait over two months to request an injunction.

The closest Plaintiffs arrive to imminent harm is through claims of potential damage to AIAC's reputation or general market confusion. But these bare allegations alone are not enough. Again, even if Boeing executives or other customers have been confused by questions of ownership, Plaintiffs have not shown either concrete injury or an imminent threat to AIAC's business that cannot be resolved in the normal course of litigation. Even if they could, Plaintiffs do not explain how much of the requested relief—enjoining actions that may dissipate MPG's assets, providing access to the books and records of MPG, or prohibiting payments to Skyhawk—would prevent or provide redress for such an injury.

Third, despite unsupported claims to the contrary, Plaintiffs' stated harm appears economic and compensable by monetary damages. *See Schrier*, 427 F.3d at 1267. Plaintiffs' own filings seem to repeatedly make the point: "the combined loss to Levie and Batista exceeds $50 million" and "MPG assets [are] worth in excess of $50 million." [ECF No. 1, at 34; ECF No. 6, at 17]. To the extent Plaintiffs instead rely on their later contention that "monetary damages alone cannot adequately compensate" for these losses, they have not made a sufficient showing of how that may be the case. [ECF No. 1, at 62]. Simply stating that trade secrets may be dissipated or relationships may be lost, without any further

factual enhancement, will not suffice. Lost trade secrets or damaged customer relationships do not imply unquantifiable damages simply because they go unidentified.

While it is recognized that "[r]ecoverable monetary loss may constitute irreparable harm [] where the loss threatens the very existence of the movant's business," Plaintiffs have offered no evidence of such a threat or an otherwise adequate explanation demonstrating imminent danger to MPG. *Wis. Gas Co.*, 758 F.2d at 674. Conclusory allegations of Mr. Stewart's mismanagement of a separate, uncontested entity are not enough. *See id*. ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur.").

Nor do Plaintiffs attempt to reconcile the economic character of AIAC's acquisition business with the contention that monetary damages would be inadequate. According to its website, AIAC owns 122 businesses over 5 continents. [*See* ECF No. 1, at 9]; American Industrial Acquisition Corporation, aiac.com (last visited Sept. 29, 2026). Despite the vast and ranging portfolio, Plaintiffs do not explain why the business of MPG is comparatively non-fungible or how the loss of MPG would be uniquely non-monetary for AIAC or Mr. Levie and Mr. Batista.

If the argument is instead that damages from market confusion or broader reputational harm to AIAC may be unquantifiable, Plaintiffs have not offered a sufficient factual basis on which to rest such a claim. And, even assuming they had, much of the requested relief would still not plausibly provide redress—and certainly not the central request to prohibit transfer or dissipation of MPG's assets.

As Plaintiffs have failed to show an imminent injury that is "certain, great, [or] actual," the Court finds that Plaintiffs have not carried their burden in showing irreparable harm.

*2. Balance of Harms and Public Interest*

Even if there were adequate evidence of irreparable harm, an injunction would be improper because Plaintiffs have not shown that the balance of harms and public interest tip in their favor, and certainly not strongly enough to justify a disfavored preliminary injunction.

First, with respect to the balance of harms, Plaintiffs contend that absent an injunction they "face the loss of business worth in excess of $50 million, the permanent dissipation of trade secrets, the destruction of the AIAC and VECCO brand's goodwill, and the loss of [customer] relationships." [ECF No. 6, at 20]. No further explanation is adduced or attempted, only a reiterated claim to rightful ownership of MPG and the contention that Defendants would "suffer no cognizable harm" if an injunction is issued. *Id*. Without more, Plaintiffs have failed carry to their burden.

As above, Plaintiffs have failed to substantiate, even minimally, the list of injuries that purportedly tip in their favor. No trade secret is identified, no lost customer relationship is adduced, no elaboration on why the harm stated in overt monetary terms should be considered in the analysis.

Moreover, Plaintiffs' argument—which is largely premised on their ultimate success in this case—is equally suited to Defendants. As a result of MPG's failure, Defendants would also "face the loss of business worth in excess of $50 million" along

with the loss of important customer relationships. Lost trade secrets and destruction of goodwill would also be detrimental to Defendants. Plaintiffs' only counterpoint is that Defendants would suffer no harm from an injunction because "they do not rightfully control" assets of MPG. *Id*. These contentions may highlight the stakes of the case, but do not, without more, weigh in favor of Plaintiffs.

If anything, the balance favors Defendants. Under Mr. Stewart's management, MPG and its subsidiaries have proceeded without Plaintiffs' involvement for over four years. Currently, according to Defendants, VECCO and VECCO Wichita carry roughly $2.7 million in monthly operating costs, have around $4.2 million in open payables and approximately 150 employees on their payroll. [ECF No. 34, at 33]. Defendants contend that a disruption to management or an operational freeze could be significant, "jeopardizing active production schedules and commitments to customers." *Id*. And, as Plaintiffs note, "[i]n the aerospace industry, supplier relationships are critical and sensitive." [ECF No. 6, at 19]. No evidence or statements are adduced that would serve to meaningfully dispute the concern that an injunction would disrupt continued operation of MPG and its subsidiaries.

Regardless of whether the balance of harms ultimately favors Defendants, Plaintiffs have not made the requisite "strong showing" necessary for a disfavored preliminary injunction. *See O Centro*, 389 F.3d at 976.

Second, with respect to the public interest factor, Plaintiffs' Motion suffers the same substantive deficiencies. Also notably absent here is an explanation justifying *immediate* injunctive relief where largely the same public interest concerns have existed since MPG's

formation. In search of an answer, Plaintiffs appear to rely on two recent events: Mr. Stewart's alleged conduct regarding Falcon Jacksonville's Boeing contract and his purported transfer of assets from MPG to Cendry in June 2026. [*See, e.g.*, ECF No. 1, at 45; ECF No. 6, at 20]. But the ownership and control of Falcon Jacksonville is not at issue here, and a change in MPG's upstream ownership or portfolio branding does not itself constitute a transfer. Plaintiffs provide no otherwise compelling answer to the lingering question of immediacy, and the Court finds the remaining grounds insufficient to establish that the public interest weighs in their favor.

As Plaintiffs have not sufficiently shown that irreparable harm will result in the absence of an injunction, or that the balance of harms and public interest factors weigh in their favor, it is unnecessary for the Court to evaluate whether Plaintiffs have established a substantial likelihood of success on the merits. Plaintiffs' Motion instead fails for lack of personal jurisdiction and improper venue, as well as failure to meet either the heightened or ordinary burden for issuance of a preliminary injunction.

## CONCLUSION

The Court finds that Plaintiffs have not established jurisdiction or venue such that an injunction should issue. Even if jurisdiction and venue were established, Plaintiffs have failed to demonstrate that they will be irreparably harmed absent a preliminary injunction. Nor have Plaintiffs shown that the balance of harms or public interest tip in their favor. As these three factors are dispositive, the Court declines to address the fourth preliminary injunction factor, substantial likelihood of success on the merits. The parties shall proceed, as they have for years, under the status quo while the case proceeds on the merits.

The findings and conclusions set forth herein do not constitute a determination on the merits but are findings made in light of the requested preliminary injunction order.

**NOW, THEREFORE, IT IS ORDERED** Plaintiff's Motion for Preliminary Injunction [ECF No. 5] is DENIED.

Dated this 30th day of September, 2026.

Kelly H. Rankin
United States District Judge